IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ALPHONCY DANGERFIELD and JEFFREY LOVE,

                Plaintiffs,

v.

DAVID GARDNER and GARY BOUGHTON,

                Defendants.

OPINION and ORDER

18-cv-1016-jdp

---

Pro se plaintiffs Alphoncy Dangerfield and Jeffrey Love were terminated from their prison jobs at Wisconsin Secure Program Facility (WSPF), which they contend was an act of race discrimination prohibited by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Defendant prison officials Captain David Gardner and Warden Gary Boughton contend that Dangerfield and Love were fired not because of their race but for violating employment rules, and they move for summary judgment. Dkt. 32.

Dangerfield and Love rely primarily on comparator evidence that some inmates who were not Black were not terminated from prison jobs even though they also violated rules. But, for reasons explained more fully in this opinion, those inmates are not similar enough to demonstrate any intentional race discrimination by defendants. Dangerfield and Love also contend that they did not actually violate any rules, but that argument misses the point. Dangerfield and Love cannot prevail by asking the court to second-guess prison discipline or employment decisions; they must produce evidence of intentional race discrimination, not just mistakes or errors of judgment. I will grant defendants' motion and close this case.

UNDISPUTED FACTS

The following facts are undisputed except where noted. Alphoncy Dangerfield and Jeffrey Love were incarcerated at WSPF, where Dangerfield was employed as a certified peer specialist and Love was employed as a peer specialist who had not yet been certified. Defendant David Gardner was a captain who supervised peer specialists. Defendant Warden Gary Boughton had final decision-making authority over hiring and termination of peer specialists.

The peer specialist program is used to help inmates develop supportive relationships with one another to minimize negative behaviors and teach pro-social skills to their peers. Inmates are interviewed, selected, and trained to become peer specialists and they receive certification after taking an exam by the Wisconsin Department of Health Services. Certified peer specialists must maintain good behavior to stay in the program, and the receipt of a conduct report or other misconduct, including violations of the certified peer specialist code of ethics, may result in removal from the program. The code of ethics is taught and applied to peer specialists even before certification, and is discussed in training, role-playing, certification exam questions, and group meetings. The code specifically states, "I will not accept gifts of money or items of significant value from those I serve. I will not loan or give money to peers." Dkt. 34-2, at 2. The Wisconsin Administrative Code states that "[a]ny inmate who gives, receives, sells, buys, exchanges, barters, lends, borrows, or takes any property from another inmate without authorization is guilty of unauthorized transfer of property." Wis. Admin. Code § DOC 303.40.

In spring of 2018, DOC staff investigated unauthorized transfers of property among inmates. Staff learned that Ivan Millham, an inmate who had participated in the peer specialist program as a mentee, was directing someone outside the prison to purchase items and send

them to other inmates at WSPF. Millham's purchases included boots for Dangerfield and shoes for Love. Defendant Gardner terminated Dangerfield from his job for violating the code of ethics by receiving unauthorized property from a peer. Gardner terminated Love from his job for violating the code of ethics by receiving unauthorized property from a peer and for not obeying staff orders: staff believed that Love had been mentoring a transgender inmate without first receiving permission to do so. Both Dangerfield and Love filed grievances stating that they were removed from their positions by Gardner without authorization from the warden, and they won those grievances. But shortly thereafter Warden Boughton approved the terminations.

Dangerfield and Love, who are both Black, contend that defendants discriminated against them based on their race. Dangerfield and Love point to four other inmates who received property from Millham—Anton Moffett, Samuel Cannon, Jesus Castillo-Dimas, and Tyrone Guider—who are either Caucasian, Native American, or Hispanic/Latino. Each of these inmates was also alleged to have been involved in the unauthorized transfer of property, yet Dangerfield and Love were the only inmates of this group terminated from their jobs.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Plaintiffs Dangerfield and Love bring race discrimination claims under 42 U.S.C. § 1983 for violations of the Equal Protection Clause. To succeed on this type of claim, plaintiffs must show that (1) they are members of a protected class; (2) they were similarly situated to members of the unprotected class; (3) and they were treated differently from members of the unprotected class. *See Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005). Plaintiffs must also

produce evidence of discriminatory intent—that is, evidence that defendants "selected a particular course of action at least in part because of its adverse effects upon an identifiable group." *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017) (citation and quotation marks omitted).

The parties do not dispute that plaintiffs are members of a protected class (they are Black) or that plaintiffs were terminated from their jobs. The parties do dispute (1) whether plaintiffs were treated worse than similarly situated prison employees who were not Black; and (2) whether plaintiffs were justifiably fired for failing to meet job standards for peer specialists or defendants used those expectations as a pretext for racial discrimination.

### A. Comparator evidence

Defendants contend that plaintiffs fail to show that they were treated differently from a similarly situated member of an unprotected class. Plaintiffs identify four inmates—Anton Moffett, Samuel Cannon, Jesus Castillo-Dimas, and Tyrone Guider—who they contend were similarly situated but who received different treatment. These other inmates, none of whom are Black, also received unauthorized property from Millham, but they were not fired from their prison jobs for breaking prison rules.

Although this case is set in a prison, plaintiffs' claims raise issues familiar to employment law cases; courts treat Fourteenth Amendment employment discrimination claims similarly to claims brought under Title VII of the Civil Rights Act. *See Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003) ("Our cases make clear that the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection [claims]."). In the Title VII context, to be "similarly situated," employees need not be "identical in every conceivable way," *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012), but the plaintiff must show that the

4

other employees "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Weber v. Univ. Research Ass'n, Inc.*, 621 F.3d 589, 594 (7th Cir. 2010).

Plaintiffs fail to meet this standard with regard to their proposed comparator inmates because the comparators did not hold peer specialist jobs. The certified peer specialist code of ethics prohibits peer specialists from accepting gifts or money from other inmates for obvious reasons: allowing mentors to receive money or property from mentees could invite mentors to abuse the position of trust they have been placed in. Peer specialists are also expected to lead other inmates by example; violating prison rules against unauthorized transfer of property could understandably be seen as falling short of that standard. Plaintiffs do not provide any evidence that inmates Moffett, Cannon, Castillo-Dimas, or Guider held jobs with similar ethical standards, or that defendants Gardner and Boughton had similar input in termination decisions for those inmates' jobs. So plaintiffs fail to show that their proposed comparators were similarly situated to them.

Plaintiffs argue that Love, as a peer specialist who was not yet certified, was unaware of the certified peer specialist code of ethics: he says that he never received or reviewed a copy. Defendants dispute this by saying that the code was used in training exercises for peer specialists working toward certification. Whether Love was actually aware of the ethics code as document is immaterial to the issues of whether Love knew that he shouldn't accept property from other inmates or whether defendants held non-certified peer specialists to elevated ethical standards. It's undisputed that Love was trained on the principles in the code of ethics even if Love didn't know where those principles came from.

5

Plaintiffs' proposed comparators did not hold jobs subject to the same standards as the standards that applied to their peer specialist positions. Without establishing that they are similarly situated to the non-Black inmates who received properly from Millham, plaintiffs cannot use the comparators to show that defendants fired them for discriminatory reasons.

## B.  Job expectations and pretext

Defendants contend that Dangerfield was fired because he broke the ethics code by accepting property from another inmate, and that Love was fired because he broke the ethics code by accepting property from another inmate and because he disobeyed staff orders regarding unauthorized mentoring of a transgender inmate.

Plaintiffs contend that their terminations were improper for various reasons, chiefly that they did not actually violate the code of ethics. And they suggest that the reasons cited by defendants in firing them masked their true, discriminatory reason for the terminations. These arguments relate to issues commonly covered in Title VII cases: whether plaintiffs met their legitimate job expectations and whether defendants' rationale for terminating them was pretextual, that is, whether "'(1) the employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on a discriminatory intent.'" *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008)).

Defendants argue that the court cannot consider plaintiffs' pretext argument because in Title VII cases invoking the familiar burden-shifting framework from *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), the court of appeals has stated that a plaintiff may not raise a pretext argument if he is unable to first state a prima facie case of employment discrimination. Dkt. 47, at 2 (citing *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 463 (7th Cir. 2014)). But the

6

court has more recently warned against elevating particular methodologies over the task at hand: deciding whether a reasonable jury could conclude—from all the evidence—that race was a motivating factor in plaintiffs' termination. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). And even in *Widmar*, the court acknowledged that "[i]n some cases . . . the issue of meeting legitimate job expectations and the question of pretext overlap." *Id; see also Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009) ("[T]he question of whether he was meeting Sybase's legitimate expectations merges with the question of whether Sybase's reasons for firing Senske are pretextual."). Because these two concepts are so closely related, I will consider them together.

Dangerfield denies that he was involved in the unauthorized transfer of property because he wasn't actually allowed to possess the boots that Millham sent to him. Dangerfield says that he thought that the boots had been sent by his family, and he filed a grievance about being denied possession of the boots. Dangerfield ultimately won an appeal of that grievance (before staff knew that the boots were improperly sent by an inmate), *see* Dkt. 36-5, although he says that he discarded the boots when he found out that they were sent from another inmate.

Love denies that he was involved in the unauthorized transfer of property because he didn't receive a property receipt informing him that he had received shoes from Millham, and he did not actually possess the shoes before they were disposed of. Love denies that he mentored a transgender inmate without staff permission, and he says that he signed his termination notice only because he thought he would receive a conduct report for disobeying orders if he refused. Both Dangerfield and Love point out that they won grievances about being removed from their jobs because Gardner did not get approval from Warden Boughton.

The problem for plaintiffs is that the question isn't whether defendants' decisions were reasonable, fair, or mistaken; this case isn't about whether defendants properly applied the code of ethics, disciplinary regulations, or property rules. Federal courts "do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions." *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 532 (7th Cir. 2003). The same principle holds true about plaintiffs being fired from their prison jobs: the question is whether defendants lied about their dissatisfaction with plaintiffs' conduct as pretext for terminating them at least in part because of their race.

A plaintiff may be able to support a discrimination claim with evidence that the employer's claims of deficient performance are so unreasonable or unsupported that they are incredible. But plaintiffs do not come close to making that showing here. There isn't smoking-gun evidence establishing that plaintiffs knew that they were receiving property from an authorized source, but it's understandable that prison staff suspected that the recipients of Millham's purchases knew about his scheme. And they had reason to believe that Dangerfield concealed the true source of the boots: in his grievance, Dangerfield falsely said that he ordered the boots himself, *see* Dkt. 36-5, at 1 ("I'm being denied from receiving the boots I order[ed] . . . ."). The parties dispute whether Love appropriately mentored a transgender inmate, but Love concedes that he had already been suspended for those activities, and he doesn't suggest that the suspension was part of a racially discriminatory plan by defendants. Plaintiffs note that Gardner improperly removed them from their jobs without warden authorization, but that doesn't get to Gardner's reason for removing them, and in any event Gardner's actions were later approved by Boughton. It doesn't matter whether Gardner exceeded his authority, because there is no evidence that he did so because of racial animus.

CONCLUSION

Ultimately, plaintiffs have only speculation that race had something to do with their terminations. They don't cite any direct evidence of discriminatory animus, such as expressions of racial bias by either of the defendants or any other prison staff. They do not show that they were treated worse than non-Black people who had the same ethical responsibilities. And their arguments about whether they actually violated work expectations or other prison rules suggests at most that defendants may have used faulty reasoning or mistaken judgment in terminating them, not that defendants intentionally chose to discriminate against them, as required for an equal protection claim. Although plaintiffs are "entitled . . . to all reasonable inferences in [their] favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (citation and quotation marks omitted). So I will grant defendants' motion for summary judgment and dismiss the case.[1]

---

[1] Defendants also contend that they are entitled to qualified immunity for their actions. Because I am dismissing plaintiffs' claims on substantive grounds, I need not consider defendants' qualified immunity argument.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 32, is GRANTED.

2. The clerk of court is directed to enter judgment and close this case.

Entered November 16, 2020.

                                              BY THE COURT:

                                              /s/

                                              _____

                                              JAMES D. PETERSON
                                              District Judge